**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 10-cv-01513-WJM-CBS

JOHNATHAN YOUNG, SR.,

     Plaintiff,

v.

JASON BROCK,

     Defendant.

---

## FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

     Plaintiff Johnathan Young, Sr. brings a claim for excessive force in violation of 42 U.S.C. § 1983 against El Paso County Sheriff's Deputy Jason Brock arising out of an incident on July 26, 2010 at the El Paso County Criminal Justice Center.  (ECF No. 251.)

     The Court held a three day bench trial from March 17-19, 2014.  (ECF Nos. 288-90.)  At the trial, Plaintiff testified on his own behalf, and called as witnesses Allen Burks, Plaintiff's cell mate at the time of the disputed events, and Jason Scott, another inmate who was housed in the same cell block as Plaintiff and Mr. Burks.  Defendant testified on his own behalf, and called the following as witnesses:  Matthew Klinedinst, Beverly Long, Delaney Jefferson, Gaylen Heinle, Gary Epperson, Paul Billiard, Thomas Thieme, Edward Kafel, and Dr. Diane Al-Abduljalil.  All of Defendant's witnesses are employed at the CJC (or were at the time of the pertinent events).

     The following are the Court's final findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

1.   Plaintiff was incarcerated at the El Paso County Jail, also known as the El Paso County Criminal Justice Center ("CJC"), in Colorado Springs, Colorado from November 19, 2009 until he was sentenced to the Colorado Department of Corrections on January 28, 2011.  (Ex. 95; Testimony of Plaintiff.)

2.   Defendant Jason Brock was, at all times relevant to this matter, a Deputy Sheriff with the El Paso County Sheriff's Office.  (Testimony of Defendant.)

**A.    CJC Wards and Modules**

3.   CJC has several modules, each of which contain different wards for housing inmates based on their classification.  Modules B (or Bravo) and C (or Charlie) are both maximum security modules. (Testimony of Deputy Matthew Klinedinst.)  Within Modules B and C are a variety of wards that serve different purposes.  (*Id.*)

4.   Wards C2 and C1 are maximum security wards with regressive privileges, respectively.  In Ward C2, inmates are allowed less time out of their cells than in medium security modules, but they have relatively unrestricted ability to buy commissary items from funds in their inmate accounts.  In Ward C1, inmates are allowed out less time than Ward C2 inmates, and their ability to buy commissary items is limited by dollar amount.  (Testimony of Deputy Matthew Klinedinst.)

5.   Module B is known as a special-management module.  There are four wards in the Bravo Module.

6.   Ward B1 houses inmates who are on administrative segregation, disciplinary lockdown, or who must be segregated from all other inmates housed in Ward B1.

Ward B2 houses inmates with mental health needs.  (Testimony of Deputy Klinedinst.)

7.   Ward B4 houses inmates with mental health needs, as well as segregated inmates and inmates who are on disciplinary lockdown.  Inmates in Ward B4 are locked in their cell for 23 hours per day, with only one hour out of their cells, and have no commissary privileges.  (Testimony of Deputy Klinedinst.)  Ward B4 is known as the "hole" by CJC inmates.  (Testimony of Allen Burks.)

8.   Each of the four Bravo wards has a door that opens up into a hallway known as the "Bravo Mod Hallway."  (Ex. 62.)  This hallway has a desk for deputies and is approximately 40 to 50 yards long.  (Testimony of Plaintiff.)  In July 2010, this hallway typically was not staffed by any deputy, and no deputy was assigned to the hallway on July 26, 2010.  (Testimony of Plaintiff; Testimony of Defendant.)

9.   The Bravo Mod Hallway leads to the CJC Main Hallway.  (Ex. 62.)  Towards the part of the hallway that exits into the CJC Main Hallway, there are a series of visiting booths, some of which have doors and some of which are open stalls.  (*Id*.)  After passing by these visiting booths, one must go through two separate doors to reach the CJC Main Hallway.  (*Id*.)

10.  CJC has a Special Detentions ("SD") cell for inmates who pose a threat to themselves, other inmates, or deputies.  The SD cell is considered a place for an inmate who needs a "time out".  Inmates are always restrained with cuffs behind their backs when taken to SD.  (Testimony of Deputy Klinedinst.)

**B.     Plaintiff's Prior Incarceration and Medical History**

11.     Since at least 1992, Plaintiff has a documented medical history of back injuries as a result of his falling off a roof while he was working as a roofer.  (Exs. A, F, I, J, L, M, N, A1, A7, A16, A17, A22, A24; Testimony of Plaintiff.)

12.     Plaintiff has been diagnosed with bi-polar disorder, paranoia and Anti-Social Personality Disorder during his previous confinements.   (Exs. M, N, X, A1, A5, A12, A15, A22, Testimony of Plaintiff.)

13.     Plaintiff has been incarcerated in the Colorado Department of Corrections ("CDOC") or the CJC off and on since the 1990s.  (Testimony of Plaintiff.)  Plaintiff has three prior felony convictions:  Distribution of Marijuana (A Class 4 Felony); First Degree Arson (A Class 3 Felony); and First Degree Burglary (A Class 3 Felony).  (*Id*.)

14.     With permission of the medical staff, Plaintiff used a cane while incarcerated at the CJC.  (Ex. 1.)

15.     Because of the cane, Plaintiff was ordinarily cuffed with his hands in front if he was attending court, medical appointments, and being transported for visitation. (Testimony of Plaintiff.)

16.     Plaintiff has a history of being non-compliant with law enforcement officers during his incarceration.  (Exs. A72, 26; Testimony of Plaintiff, Defendant, Deputy Klinedinst & Lt. Gaylen Heinle.)

17.     Plaintiff also has a history of initiating lawsuits against government agencies based on his incarceration, or threatening to initiate lawsuits based on his incarceration. (Exs. 42, 6, 88, A82-A84; Testimony of Plaintiff.)

4

**C.     Prior Interactions between the Parties**

18.     Plaintiff and Defendant have had various interactions during Plaintiff's stays at the CJC.

19.     On March 13, 2010, Plaintiff was being housed in C2.  (Testimony of Plaintiff.) Defendant observed Plaintiff attempt to be an aggressor with another inmate. (Testimony of Defendant.)  Following this incident, Defendant had Plaintiff moved from Ward C2 to Ward C1, which was accompanied by a loss of privileges.  (Ex. 70.)  Plaintiff felt wronged by Defendant moving him, instead of the other inmate, who he believed to be the aggressor. (Testimony of Plaintiff.)

20.     Plaintiff, angry with Defendant for what he perceived as an unjustified move to a more restrictive ward, yelled foul comments about Defendant.  Deputy Bradley Rickrel overhead these comments.  (Ex. 70.)  Deputy Rickrel wrote Plaintiff up for his actions, and Plaintiff lost visitation and canteen privileges for ten days.  (Ex. 70; Testimony of Plaintiff.)

21.     On July 25, 2010, Plaintiff was being housed in Ward C1.  In response to another inmate's pleas, Plaintiff took an extra sack lunch off the cart and slipped it under the door of that inmate's cell in violation of CJC rules.  (Ex. A43.)  Deputies Myers and Mackey confronted Plaintiff about his actions, searched Plaintiff's cell, and found contraband.  (*Id*.)  During the search, Plaintiff left the cell, walked out to the common area, and hit his cane on a table.  (*Id*.)  After doing this, Plaintiff was handcuffed and walked to SD.  (*Id*.)

22.     Upon being released from SD on July 25, 2010, Plaintiff was placed in Ward B4.

(Ex. A43.)

**D.     Events on July 26, 2010 — Plaintiff's Version** [1]

23.     On July 26, 2010, Deputy Brock was assigned to supervise Ward B4.  (Testimony

of Plaintiff; Testimony of Defendant; Ex. 57 at 6.)

24.     On that day, Defendant was passing out sack lunches to the inmates in Ward B4.

(Testimony of Plaintiff; Testimony of Defendant.)

25.     After Defendant had handed out lunch bags to Plaintiff and his cellmate, Mr.

Burks, Plaintiff looked in his lunch bag and noted that he did not receive a

Kool-Aid.  (Testimony of Plaintiff; Testimony of Allen Burks.)

26.     Plaintiff called out to Defendant that his lunch bag was missing the Kool-Aid.

(Testimony of Plaintiff; Testimony of Allen Burks.)

27.     Deputy Brock responded to Plaintiff by stating, "it sucks to be you."  (Testimony of

Plaintiff.)

28.     Plaintiff responded to Defendant Brock's comment by calling him a "fat f**k."

(Testimony of Plaintiff; Testimony of Allen Burks.)

29.     Plaintiff testified that, at that point, he considered the incident to be over.  He said

nothing further to Defendant, sat down on the bed, and started to eat his lunch.

(Testimony of Plaintiff.)  He was not standing at the door, nor was he yelling or

cursing.  (*Id.*)

30.     Defendant Brock's report of the incident reflects that, at the time Defendant

---

[1]  In this section, the Court will simply recite Plaintiff's and Plaintiff's witnesses' version of events that occurred on July 26, 2010, followed by Defendant's and Defendant's witnesses' take on the disputed events.  The Court will make its factual findings as to which witnesses it finds credible in the Analysis section below.

returned to Plaintiff's cell, at which time, Plaintiff was sitting on his bunk.  (Ex. 69.)

31.   Defendant then opened the cell door and then instructed Plaintiff to "cuff up."

      (Testimony of Plaintiff; Testimony of Allen Burks.)

32.   Plaintiff put his hands in front of him and asked if he could "cuff up" in the front or

      use his cane.  (Testimony of Plaintiff; Testimony of Allen Burks.)  Defendant

      insisted Plaintiff be handcuffed behind his back.  (*Id*.)

33.   Plaintiff complied with Defendant Brock's order without objection or resistance.

      (Testimony of Plaintiff; Testimony of Allen Burks.)

34.   Defendant did not call for the assistance of other deputies in removing Plaintiff

      from his cell.  (Testimony of Plaintiff; Testimony of Defendant.)

35.   Defendant Brock's handcuffing of Plaintiff behind his back to escort Plaintiff out of

      his cell was improper.  (Testimony of Plaintiff.)

36.   Defendant informed Plaintiff that he was taking him to Special Detentions.

      (Testimony of Plaintiff.)

37.   Defendant led Plaintiff out of his cell and out of Ward B4.  (Testimony of Plaintiff;

      Testimony of Allen Burks.)

38.   In escorting Plaintiff across and out of Ward B4, Defendant began to apply upward

      pressure on Plaintiff's handcuffed hands.  (Testimony of Plaintiff; Testimony of

      Defendant.)  Plaintiff experienced serious pain and discomfort when Defendant

      applied such upward pressure on Plaintiff's handcuffed hands.  (Testimony of

      Plaintiff.)

39.   While escorting Plaintiff across and out of Ward B4, Defendant was also pushing

      and shoving Plaintiff.  (Testimony of Plaintiff.)  Plaintiff requested that Defendant

transport him in a wheelchair, but Defendant refused.  (*Id*.)  Plaintiff was not straining against Defendant or resisting.  (*Id*.)

40.  Plaintiff does not recall if the other inmates in Ward B4 were yelling as Plaintiff was being escorted across and out of the ward.  (Testimony of Plaintiff.)  However, generally when a large number of other inmates start yelling, the ward is completely shut down and many deputies respond.  (*Id*.)

41.  Upon reaching the door to the Bravo Mod Hallway, Defendant pushed Plaintiff through the door.  (Testimony of Plaintiff.)  Defendant had left that door cracked open.  (*Id*.)  Plaintiff had seen Defendant leave doors cracked open on previous occasions.  (*Id*.)  Other deputies have also seen doors at the CJC left cracked open at various times.  (Testimony of Matthew Klinedinst.)

42.  Despite the fact that he was the only deputy on duty in the ward at that time, Defendant did not call for another deputy to supervise Ward B4 in his absence. (Testimony of Defendant.)  Defendant admitted that it was a mistake to leave Ward B4 without any guard.  (*Id*.)

43.  After leaving Ward B4 and entering the Bravo Mod Hallway, Defendant and Plaintiff were alone and out of the view of the inmates in Ward B4.  (Testimony of Plaintiff; Testimony of Allen Burks.)

44.  Defendant increased the upward pressure on Plaintiff's cuffed hands.  (Testimony of Plaintiff.)  At this point, Plaintiff was bent over so far that he could see only the floor.  (*Id*.)

45.  Plaintiff asked Defendant not to apply such upward pressure on his handcuffed

hands, but Defendant ordered Plaintiff to keep walking and applied more upward pressure.  (Testimony of Plaintiff.)

46.   Plaintiff asked Defendant to get him a wheelchair or other assistance, but Defendant refused.  (Testimony of Plaintiff.)

47.   The upward pressure on Plaintiff's handcuffed hands caused Plaintiff pain and caused him to lose his balance.  (Testimony of Plaintiff.)

48.   Plaintiff repeatedly told Defendant that he was causing him pain, but Defendant did not stop.  (Testimony of Plaintiff.)

49.   As a result of Defendant Brock's continued application of upward pressure on Plaintiff's handcuffed hands, Plaintiff collapsed in pain in the Bravo Mod Hallway. (Testimony of Plaintiff.)  He fell flat on his stomach with his hands restrained behind his back near the first open visiting booth stall.  (*Id*.; Ex. 62.)

50.   Plaintiff was physically unable to move, except for his head, and was suffering excruciating pain.  (Testimony of Plaintiff.)  The pain emanated from his spine and spread into all parts of his body.  (*Id*.)  Because the pain he felt was similar to a previous injury, Plaintiff believes that a nerve in his back was pinched.  (*Id*.)

51.   Plaintiff told Defendant that he could not get up.  Plaintiff asked Defendant to get him medical attention, but Defendant refused.  (Testimony of Plaintiff.)

52.   Instead, Defendant fell on to Plaintiff's back, pulled Plaintiff's feet up behind him, grabbed Plaintiff's hair, and started beating Plaintiff's head into the floor, screaming, "stop resisting!"  (Testimony of Plaintiff.)

53.   Deputy Brock then finally called for the assistance of other deputies.  (Testimony of Plaintiff.)

54.   Deputy Matthew Klinedinst, another deputy assigned to work at the CJC that day, arrived first.  (Testimony of Plaintiff.)  Plaintiff was still face down on the floor but could see Deputy Klinedinst because of the way his head was facing.  (*Id.*)  Plaintiff again requested medical attention.  (*Id.*)

55.   Two additional deputies, Deputy Beverly Long and Deputy Jefferson, then arrived to assist Defendant, and the four deputies picked up Plaintiff in a "four-point carry," in which each of the four deputies carried one of the inmate's four limbs.  (Testimony of Plaintiff, and Deputies Long and Jefferson.)  Plaintiff was carried toward the CJC Main Hallway.  (Testimony of Plaintiff.)

56.   En route to the CJC Main Hallway, the deputies and Plaintiff passed through two doorways, and the deputies banged Plaintiff's head on the doorjamb in each doorway.  (Testimony of Plaintiff.)

57.   Plaintiff did not resist being carried or thrash his body.  (Testimony of Plaintiff.)  Plaintiff continued to request medical attention.  (Testimony of Plaintiff.)

58.   Once in the CJC Main hallway, Defendant lost his grip on Plaintiff, and Plaintiff was dropped on the floor.  (Testimony of Plaintiff.)  He hit his head on the floor when he was dropped.  (*Id.*; Ex. 82 at 11:54:37.)

59.   An emergency restraint chair was then brought out, and the deputies began to restrain Plaintiff in it.  (Testimony of Plaintiff; Tr. Ex. 82 at 11:55:30.)

60.   Plaintiff did not resist the deputies' efforts until he saw that the deputies were going to put a spit hood on his head.  (*Id.*; Tr. Ex. 82 at 11:57:08.)

61.   Once he saw the spit hood, Plaintiff started having flashbacks to a previous incident he had at the CJC approximately ten years prior, and he started panicking

10

and screaming because he was afraid for his life.  (Testimony of Plaintiff.)  He also had, or thought he was having, a seizure and an asthma attack, and he yelled to the deputies that he was suffering these ailments.  (*Id*.)

62.  After he was secured in the emergency restraint chair, Plaintiff was wheeled to a Special Detentions unit.  (Testimony of Plaintiff.)  Because of concerns for his health, he was later taken to medical.  (*Id*.)  Hours later, he was returned to his cell in a wheelchair.  (*Id*.; Testimony of Allen Burks.)

**E.   Events on July 26, 2010 — Defendant's Version**

63.  On July 26, 2010 at approximately 11:50 a.m., Plaintiff began loudly protesting that he did not have any Kool-Aid in his lunch.  Plaintiff shouted obscenities at Defendant.  (Ex. 69 pp. 1, 6; Testimony of Burks and Scott; Testimony of Defendant.)  Plaintiff's behavior was disruptive to the ward.  Other inmates in Ward B4 were yelling in response to Plaintiff's outbursts.  Defendant responded to restore order to the ward.  (Ex. 69 p. 1; Testimony of Defendant.)

64.  Defendant asked Plaintiff to place his arms behind his back, so that Defendant could apply handcuffs.  Plaintiff complied.  Defendant led Plaintiff from the ward, maintaining control of Plaintiff by holding his handcuffs. (Exs. 69 p. 1; 81; Testimony of Defendant.)

65.  Defendant, by his own admission, maintained some upward pressure on the handcuffs as he escorted Plaintiff from the ward. His purpose was to maintain control of Plaintiff.  (Ex. 69 p.1; Testimony of Defendant.)

66.  Plaintiff pushed and pulled against Defendant as Defendant was leading Plaintiff

out of Ward B4.  (Testimony of Defendant.)

67.   Deputy Matthew Klinedinst was the Lead Deputy, or roving Deputy on July 26, 2010.  Deputy Klinedinst saw Defendant leading Plaintiff from Ward B4 ward. Deputy Klinedinst observed Plaintiff without a shirt, which signaled to him that a problem was occurring because inmates are ordinarily clothed when being transported.  Deputy Klinedinst opened the door to Ward B4, and the three entered the Bravo Mod Hallway.  (Ex. 69 pp. 1, 6; Testimony of Defendant & Deputy Klinedinst.)

68.   While in the Bravo Mod Hallway, Deputy Klinedinst double locked Plaintiff's handcuffs.  (Testimony of Defendant & Deputy Klinedinst.)

69.   Approximately two-thirds down the length of the Bravo Mod Hallway, Plaintiff dropped to his knees, claiming that he could no longer walk.  Deputies Brock and Klinedinst urged Plaintiff to get back on his feet to continue walking.  Plaintiff refused, yelling at the deputies that they were going to have to carry him.  Plaintiff was held in a kneeling position while Deputies Brock and Klinedinst called for assistance.  Plaintiff was non-compliant, continued to yell and threatened to sue the deputies.  (Ex. 69; Testimony of Defendant & Deputy Klinedinst.)

70.   Two more deputies, Beverly Long and Delaney Jefferson, hearing the call for assistance, arrived to assist in the transport.  Deputies Brock, Klinedinst, Long, and Jefferson each took hold of one of Plaintiff's appendages.  Plaintiff, who had been in a kneeling position, was then carried face down out into the mail hallway of the Criminal Justice Center, in what is known as a "four-point carry." Plaintiff continued to be non-compliant.  (Ex. 69 pp. 1, 5, 6; Testimony of Defendant &

Deputies Klinedinst, Long, Jefferson, and Lt. Gaylen Heinle.)

71.     As the Deputies carried Plaintiff from the Bravo Mod Hallway to the CJC Main

Hallway, Plaintiff was thrashing his body, resisting the attempts of the Deputies to

control him.  In so doing, Plaintiff hit his own head against one or more of the door

jambs of the two doors leading from the Bravo Mod Hallway into the CJC Main

Hallway.  Plaintiff was cursing the Deputies and still threatening litigation as he was

being carried.  (Exs. 69 & 82; Testimony of Defendant, Deputies Klinedinst, Long,

Jefferson, and Lt. Heinle.)

72.     Because of Plaintiff's resistance, it was difficult to maintain a grip on him.  As the

Deputies proceeded into the CJC Main Hallway, Plaintiff continued to twist his

body, causing the Deputies to lower him to the floor to get a better grip on him.  At

this time, Plaintiff intentionally hit his own head on the floor.  The deputies lifted

Plaintiff off the floor to prevent him from hitting his head on the floor again.  The

deputies then gently lowered Plaintiff to the floor.  (Exs. 69 & 82; Testimony of

Defendant, Deputies Klinedinst, Long, Jefferson, and Lt. Heinle.)

73.     Former Lieutenant Gaylen Heinle witnessed Plaintiff "attempt to swing his head

into the door frame" and strike his own head on the floor of the CJC Main Hallway.

He therefore ordered the production of a restraint chair from the CJC Intake and

Release Area.  Two deputies responded with the restraint chair.  The deputies

then secured Plaintiff in the chair.  (Ex. 82; Testimony of Lt. Heinle.)

74.     The deputies were having difficulty getting Plaintiff to sit back in the chair to secure

him.  Deputy Long used a technique called a "sternum rub" to get him to sit back in

the chair.  Sternum rubs are a pain-compliance technique upon which deputy

sheriffs are formally trained. This is a compliance technique used by law enforcement on resistive inmates. (Ex. 69 p. 6, 8; Testimony of Klinedinst, Long & Kafel.)

75.    Plaintiff was taken to SD in the restraint chair, and was later returned to his cell in Ward B4.

**F.    Plaintiff's Injuries**

76.    After the incident on July 26, 2010, Plaintiff suffered, without limitation, bruises and several knots on his head and chest, bruises on his shins and arms, and cuts on his wrists. (Testimony of Plaintiff, Burks and Scott.) He also suffered headaches, dizzy spells, and back pain. (Testimony of Plaintiff.) His back pain was so severe that at times he could not get out of bed, and his cell mate Allen Burks had to help him do things. (*Id.*)

77.    On July 28, 2010, after Plaintiff had been moved to Ward B4, Mr. Scott went to see the Plaintiff at his cell. At that time, Plaintiff showed Mr. Scott his injuries, including a soft-ball sized red mark on his chest and a golf-ball sized knot on his head. (Testimony of Jason Scott.) Plaintiff also told Mr. Scott that he had been in an altercation with Deputy Brock, and that Deputy Brock had pulled him into the hallway and used excessive force on him in an unprofessional manner. (*Id.*)

78.    In the months immediately after July 26, 2010, Plaintiff was crying on a daily basis due to pain. (Testimony of Plaintiff.) On a scale of one to ten, his pain was generally a nine or ten out of ten, and his best days were a seven out of ten. (*Id.*) Walking and other daily activities became much harder for Plaintiff than they had

been previously.  (*Id.*)

79.   Plaintiff was seen by medical staff for his injuries and was prescribed pain

medication soon after the incident.  (Testimony of Plaintiff; Tr. Exs. 2, 4, 10 & 17.)

He was prescribed 800 mg of ibuprofen, which is prescribed for moderate to

severe pain and is the maximum dose at any one dosing time.  (Testimony of

Plaintiff; Testimony of Dr. Al-Abduljalil; Tr. Exs. 4, 5 & 10.)  Plaintiff was also

prescribed 1000 mg of Tylenol.  (Tr. Ex. 10.)

80.   When Dr. Al-Abduljalil personally examined Plaintiff on November 3, 2010, she

found that Plaintiff had a decreased range of motion secondary to his pain, had

guarded movement, and had tenderness at all lumbar levels, but especially L4-5.

(Testimony of Dr. Al-Abduljalil; Tr. Ex. 17.)  Dr. Al-Abduljalil concluded that that

Plaintiff was suffering from myofascial low back pain, which is pain caused by a

musculoskeletal injury.  (Testimony of Dr. Al-Abduljalil; Tr. Ex. 17.)  At trial, Dr.

Al-Abduljalil conceded that Plaintiff suffered an exacerbation of chronic pain, and

may have suffered an exacerbation of his prior underlying back problems.

(Testimony of Dr. Al-Abduljalil.)

81.   Plaintiff also received x-rays of his chest and back.  However, the chest x-rays

were not performed until more than a month after the July 26, 2010 incident (Tr.

Ex. 12), and the back x-rays were not performed until more than three months

after the incident (Tr. Ex. 19).

82.   Plaintiff continues to experience, without limitation, migraines, back pain, bulging

discs, pain on his left side, and numbness in his legs as a result of the July 26,

2010 incident.  (Testimony of Plaintiff.)

15

**G.     Surveillance Video Footage**

83.     There is video-surveillance footage of the incidents which occurred inside the B4
        Mod (Ex. 81) and in the Main Hallway (Ex. 82).  However, there is no video footage
        of the incidents in the Bravo Mod Hallway.

84.     Sometime during March and April of 2010, CJC's surveillance-video digital video
        recorder ("DVR") systems were failing.  El Paso County was in the process of fully
        replacing the video monitoring and video recording system in CJC.  (Exs. 63-68;
        A25-35; Testimony of Lt. Paul Billiard, Investigator Gary Epperson, and Mr. Tom
        Thieme.)

85.     The DVRs for the video surveillance system in the Bravo Mod area—including the
        hallway—malfunctioned numerous times from sometime in 2009 until the entire
        DVR system throughout the jail was finally replaced in the first quarter of 2011.
        (Exs. 63-68; A25-35; Testimony of Lt. Billard.)

86.     The Bravo Mod hallway video system was not recording to DVR on July 26, 2010.
        However, the DVR system was was working in Ward B4 and the CJC Main
        Hallway.  (Exs. 63-68; A25-35; Testimony of Lt. Billard, Investigator Epperson, and
        Mr. Theime.)

**H.     Plaintiff's Complaints After the Incident**

87.     After the July 26, 2010 incident, Plaintiff filed a number of grievances and other
        complaints regarding the disputed events.  His description of what occurred
        between himself and Defendant (as well as other deputies involved) varied
        significantly in his various reports.  The following is a list of complaints and the

16

dates on which they were filed.

88.   July 27, 2010:  Plaintiff first complains that he was "placed in Restraints in chair last night" and "too much force was used" and he "thinks something is broke."[2]  His initial complaint was of "chest pains".  He states he has neck pain and across chest.  He describes the pain as "moderate."  He is asked if there any limitation of movement or activity, and he states "No."  X-rays and ibuprofen are ordered.  (Ex. 2.)

89.   July 31, 2010:  Plaintiff writes about "my injuries done by deputies".  Plaintiff writes about wanting pictures taken of the "bruises and notts all over my body acured from deputies Brock, Klinedist and four or five other's. . ."; and he goes on to complain about the "inappropriate touching of my genitals. . ."[3]  (Exs. 3 & 24.)

90.   August 4, 2010:  In Plaintiff's first written complaint, he never mentions Defendant jumping or landing on his back, grabbing his head and banging it into the floor. Instead, Plaintiff writes, "I was guilty of verbal abuse However brock took my comment about him being fat very personal and this was the reason for his excessive force on me it was unnecessary because when I was told to cuff up I did as he said so for him to pull my arms up past my head backwards with my medical condition or even cuffing behind my back and making me walk without my can was cruel and unuesal punishment which caused me to lose my balance and my ability

---

[2]  Plaintiff's written statements are set forth herein in their original form, including all misspellings and grammatical errors.

[3]  In addition to his excessive force claim, Plaintiff initially brought a claim for sexual assault against Deputy Jaeger.  (ECF No. 75.)  That cause of action was dismissed for failure to state a claim.  (ECF No. 118.)

to walk. . ." (Ex. 23.)

91.   August 6, 2010:  Plaintiff is seen in medical; only medical complaint is for "hemoroids" and "dry skin."  Plaintiff "repeats threats of lawsuits b/c disciplinary action. . ." (Exs. 4 & 6.)

92.   August 7, 2010:  Plaintiff asks about his "pictures and x-ray. . .and my genitals fondled by a deputy. . ."  (Ex. 25.)

93.   August 12, 2010:  Plaintiff complains his "eyes are watering since my incident on July 26, 2010.  I have been having severe back pain and chest pains and my eye sight has not been to clear."  He complains of "dizzy spell".  He requests a "specialist" for his back.  (Ex. 8.)

94.   August 13, 2010:  Plaintiff complains about "issues with back and eyesight".  (Ex. 7.)

95.   August 17, 2010:  Plaintiff complains about saving the "videos" and his "physical abuse."  (Ex. 26.)

96.   August 18, 2010:  Plaintiff states, "I was beat up by deputies and my head banged into doorframes of steel. . ."; and then he complains of injuries resulting from this and from being "fondled".  (Exs. 9 & 27.)

97.   August 19, 2010:  Plaintiff writes a letter to the El Paso County Commissioners. Plaintiff gives a detailed explanation of his claims he was "sexually harassed and abused" by Deputy Jaeger.  Plaintiff vaguely references "Then on July 26th I was seriously abused physically, by Deputy Brock, Deputy Klinedist, Deputy long, and two other deputies who's names I don't have. . ."  Plaintiff acknowledges at this time he has been denied the "videos" of these two incidents.  (Ex. 23.)

98.   August 20, 2010:  Plaintiff answers the question of what was the original injury with

18

"after being taken down by deputies during an altercation". (Ex. 10.)

99.     September 13, 2010:  Plaintiff writes, "I have been having severe back and head

        pain's and constant blurry vision since deputy excessive force and abuse resulting

        in head injuries. . ." (Ex. 28.)

100.    September 15, 2010:  Plaintiff files an Amended Complaint in this case, and states

        "Claims three, four, five can not be completed at this time. . . . will be about . . .

        claim four physical abuse/excessive force . . ." (Ex. A83.)

101.    September 16, 2010:  Plaintiff is interviewed by Investigator Epperson about the

        July 26, 2010 incident.  Plaintiff for the first time makes claims that Deputy Brock

        came down on his back, grabbed his legs and head, and then "slammed" his face

        into the floor more than once.  Plaintiff then states that, after this, the "other"

        deputies arrived.  He then claims that, while being carried, his head was hit on the

        door jam on two separate doors.  Plaintiff then states that, when he was in the

        main hall being placed into the restraint chair, Deputy Long pounded on his chest.

        He acknowledges that he was not complying with orders and was resisting.  This is

        the first time Plaintiff states that he was beaten by Defendant in the Bravo Mod

        Hallway.  (Ex. 61.)

102.    September 18, 2010:  Plaintiff complains of injuries to his "chest cartlarge . . . and

        head injury casued by Deputies . . . On July 26, 2010 I was putting in kites about

        head injuries bruises, cuts on wrist that were physically on my body done by Jail

        Staff. . ." (Ex. 29.)

103.    September 26, 2010:  Plaintiff states, "All my meds for the pain in my back has run

        out also since brock fell on my back on July 20, 2010. . . ." (Ex. 14.)

104.   October 17, 2010:  Plaintiff writes he needs to see a doctor "because of problems
       I'm having in my spine and my head due to injuries on July 26, 2010 by Deputy
       Brock, et al., All involved."  (Ex. 38.)

105.   October 19, 2010:  Plaintiff writes, "I'm having with my lower back & spine, and my
       head due to injuries cause by Dep. Brock et. al., involved on July 26, 2010. . ." (Ex.
       39.)

106.   October 22, 2010:  Plaintiff states, "since the injuries caused by Deputies on July
       26, 2010."  (Ex. 16.)

107.   November 11, 2010:  Plaintiff references "excessive force by Deputy Brock et. al.,
       and the sexual abuse by Deputy Jeager".  (Ex. 41.)

108.   December 10, 2010:  Plaintiff files a "Supplemental Pleading" in this case stating,
       in part, "Deputy Brock flopped down on the plaintiff's back with an elbow . . . and
       grabbed plaintiff's hair and began beating his head on the ground, then stopped
       and called for assistance. . ."  (Ex. A84.)

109.   January 21, 2011:  Plaintiff files his amended Prisoner Complaint.  In this
       Complaint, Plaintiff describes in detail what he claims occurred on July 26, 2010, to
       include "brock fell on my back pulled my feet up behind me and grabbed my hair
       and started beating my head into the floor screaming stop resisting."  (Ex. 88.)

## II.  CONCLUSIONS OF LAW

The sole claim remaining in this case is one for excessive force in violation of
Plaintiff's Fourteenth Amendment rights under the Due Process Clause.  "It is clear . . .
that the Due Process Clause protects a pretrial detainee from the use of excessive force
that amounts to punishment."  *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989); *Culver*

*v. Torrington*, 930 F.2d 1456, 1460, n.7 (10th Cir. 1991).  "Force inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment."  *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003).

To determine whether a plaintiff has established a violation of the Fourteenth Amendment by the alleged use of unreasonable force against a pretrial detainee in a jail, the Court must consider the following factors:  (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor.  *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010).

Plaintiff alleges that Defendant used excessive force by handcuffing him behind his back while in his cell, using extreme upward pressure on the handcuffs while escorting Plaintiff out of the cell block, and, while in the Bravo Mod Hallway, dropping onto Plaintiff's back and slamming his head into the floor.  The Court will consider first whether the events within Ward B4 constituted excessive force, and will then review the events in the Bravo Mod Hallway.

**A.     Within Ward B4**

Based on the evidence presented at trial, the Court finds that the following occurred within Ward B4 on July 26, 2010:

Defendant was on duty in Ward B4 and delivered lunches to the inmates.  Plaintiff noticed that his lunch did not contain a kool-aid and notified Defendant.  Defendant was unsympathetic to Plaintiff, and Plaintiff called Defendant a "fat f**k".  After Defendant walked away, Plaintiff continued yelling obscenities, and generally being disruptive.

21

Defendant returned to Plaintiff's cell to take him to SD to allow him to cool off.  Defendant told Plaintiff to cuff up in the back, and Plaintiff complied.  Defendant led Plaintiff out of the cell, across the Ward, and into the hallway.  As they moved through the common area in the Ward, Defendant applied significant upward pressure on the handcuffs and pushed Plaintiff along.

The Court acknowledges that Plaintiff denies that he caused any disruption other than calling Defendant a "fat f**k".  The Court does not find this evidence credible.  Defendant has been a deputy at CJC long enough that he has likely been called much worse without taking action against the prisoner.  Defendant testified that he only decided to take Plaintiff to SD after Plaintiff continued to be disruptive because Plaintiff's actions were upsetting other inmates in the Ward, and could cause emotions to spiral out of control.  The video footage supports this testimony in that it shows Plaintiff being escorted in a hurried manner without a shirt.  Were there no immediate need to remove Plaintiff, Defendant would not have needed to walk so quickly across the common area.  Moreover, the deputies consistently testified that prisoners were transported without an article of clothing only when there was an immediate need to move someone.

As a result, the Court concludes that Plaintiff has failed to show that Defendant used excessive force in handcuffing Plaintiff behind the back and applying upward pressure on the handcuffs.  Although Plaintiff was usually handcuffed in front of his body so that he could use his cane, he testified that he was able to walk short distances without his cane.  Other deputies testified that, regardless of any medical profile, inmates were always handcuffed behind their back when being taken to SD due to disciplinary issues.  The reason for this is to minimize the inmate's range of motion in an effort to protect

22

inmate and deputy safety during that kind of transport.  Because Plaintiff was removed

from the Ward for disciplinary issues, the Court does not find that Defendant's

handcuffing of Plaintiff behind his back was unreasonable.

Additionally, there is no evidence that Defendant handcuffing Plaintiff behind his

back caused any injury.  Certainly being handcuffed behind the back is uncomfortable,

particularly with Plaintiff's alleged physical impairments, but there was no evidence that

this force caused Plaintiff any harm.  With regard to motive, there was no evidence that

Defendant handcuffed Plaintiff behind the back as an act of malice.  Defendant and the

other deputies testified that all inmates were handcuffed behind their back when being

transported to SD for disciplinary violations.  Thus, rather than acting with malice towards

Plaintiff, Defendant was simply following policy.  Having considered the relevant factors,

the Court finds that Defendant did not use excessive force when he handcuffed Plaintiff

behind his back to escort him to SD.  *See Boomer v. Lewis*, 2009 WL 2900778, at *5

(M.D. Pa. Sept. 9, 2009) (inmate was not subjected to excessive force when he was

handcuffed behind the back rather than in front of his waist); *Freels v. Tipton Cnty.*, 2010

WL 2364432, *12 (W.D. Tenn. June 9, 2010) (handcuffing arrestee with prosthetic leg

behind the back was not excessive force).  *Compare Kopec v. Tate*, 361 F.3d 772, 774

(3d Cir. 2004) (finding excessive force when handcuffs placed behind the back caused

permanent nerve damage to plaintiff's wrist).

The Court also finds that the manner in which Defendant escorted Plaintiff across

the common area of Ward B4 was reasonable.  Defendant removed Plaintiff from the

Ward for being disruptive, which was causing other inmates in the Ward to become

agitated.  Such circumstances are time-sensitive, and Defendant's desire to act quickly

was justified.  Although Defendant admits that he maintained a constant upward pressure on Plaintiff's handcuffs, the Court finds the amount of force was reasonable in relation to the need to keep Plaintiff moving and get him out of the Ward expeditiously.  There is no evidence that the upward pressure caused Plaintiff any additional injury to his back or otherwise, or that Defendant's actions were malicious.  *See Kettering v. Harris*, 2009 WL 508348, at *17 (D. Colo. Feb. 27, 2009) (upward pressure on handcuffs while transporting prisoner did not amount to excessive force); *Cole v. Litscher*, 2005 WL 627791, at *13 (W.D. Wisc. March 15, 2005) (referring to continuous upward pressure on handcuffs as "*de minimis* use of force").

As such, the Court finds that the Defendant's actions in Ward B4 did not amount to excessive force under the Fourteenth Amendment.

**B.    Bravo Mod Hallway**

Based on the evidence presented at trial, the Court finds that the following events occurred in the Bravo Mod Hallway.  Deputy Klinedinst saw Defendant escorting Plaintiff out of Ward B4 without a shirt on, which alerted Deputy Klinedinst to the fact that something had gone wrong.  Deputy Klinedinst opened the door between Ward B4 and the Bravo Mod Hallway, and Plaintiff and Defendant came through.  Deputy Klinedinst followed Plaintiff and Defendant down the Bravo Mod Hallway and, at some point, Plaintiff dropped to his knees.  Plaintiff told the deputies that he could not walk any farther, and that they would have to carry him.

Defendant then called for assistance, and Deputies Beverly Long and Delaney Jefferson responded.  The Deputies got Plaintiff onto his stomach and each picked up an

appendage, such that they were carrying Plaintiff in a "four-point carry". While the

Deputies were carrying Plaintiff through the doorway into the Main Hallway, Plaintiff's

head made contact with the door frame.[4]

Once they were in the Main Hallway, Defendant lost his grip on Plaintiff. Plaintiff

fell to the floor, and his head made contact with the cement floor. The Deputies lowered

Plaintiff to the floor, and Lt. Gaylen Heinle called for the restraint chair. Plaintiff resisted

being placed into the chair, pushing against the Deputies as they attempted to restrain

him. As Plaintiff continued to resist, Deputy Long used a sternum rub to get Plaintiff to sit

back. This technique was effective, and Plaintiff was restrained in the chair and taken to

SD. Later that day, he returned to the Brave 4 Ward in a wheelchair. Plaintiff had knots

and bruises on his head and chest, and has suffered significant back pain since this

incident.

As is evidenced by the Court's findings set forth above, the Court does not credit

Plaintiff's version of events in the Bravo Mod Hallway. Specifically, the Court finds that

Plaintiff fabricated the story about Defendant falling onto his back, pulling his legs into the

air, and beating his head into the floor while yelling "Stop Resisting!" The first thirteen

times Plaintiff contacted prison officials about various aspects of the events on July 26,

2010, he failed to even once make any reference to these events. For example, the day

after the incident, Plaintiff sought medical care for injuries he suffered while being placed

in the restraint chair. (Ex. 2.) On July 31, 2010, Plaintiff attributes his injuries to all of the

deputies involved with carrying him and placing him in the restraint chair, without making

---

[4] It is unclear whether Plaintiff intentionally hit his head, or whether this act was unintentional. The Court need not make this finding as it is not material to the Court's analysis.

any particular reference to the Defendant.  (Exs. 3 & 24.)  On August 18, 2010, Plaintiff

again complained that he had lumps and bruises all over his body from the Deputies'

actions on July 26, 2010, but again fails to single out the Defendant in any way.  (Ex. 9.)

On August 19, 2010, Plaintiff wrote a letter to the El Paso County Commissioners

complaining that he was "seriously physically abused" by Defendant, Deputy Klinedinst,

Deputy Long, and two other deputies.  (Ex. 73.)

The first time Plaintiff specifically mentions his interactions with Defendant, in a kite

submitted on August 4, 2010, he references only the fact that Defendant handcuffed him

behind the back and pulled his arms upwards.  (Ex. 23.)  There is no mention of

Defendant dropping onto his back, pulling Plaintiff's legs up, or slamming Plaintiff's head

into the floor.  (*Id.*)  These details were not added until September 16, 2010, when

Plaintiff was interviewed by Investigator Epperson.  (Ex. 61.)  At that point, Plaintiff finally

and for the first time stated that Defendant came down on his back, grabbed his legs and

head, and slammed his face into the floor more than once.  (*Id.*)

It is inconceivable to the undersigned that a prisoner—particularly one with as

much litigation savvy as the Plaintiff—would omit such important details, about such

allegedly egregious behavior on the part of Defendant, from all of his complaints for

nearly two months after the incident.  Following Plaintiff's story through these grievances,

the Court finds that Plaintiff's initial version of the events was accurate, and that he later

progressively embellished the events to amplify the degree of force used.

Moreover, the injuries Plaintiff suffered can be explained by the essentially

undisputed events that occurred on July 26, 2010.  Plaintiff admits that he dropped to the

floor and refused to walk to SD, forcing the Deputies to carry him in a four-point carry.

Being carried in this manner for any distance could easily aggravate a pre-existing back condition.  The lumps on Plaintiff's head could be the result of it striking the doorjamb when he was carried through, or when he hit the floor when Defendant's grip slipped.  Finally, Deputy Long admits to using a sternum rub on Plaintiff's chest to subdue him in the restraint chair.  Thus, none of Plaintiff's injuries support his contention that Defendant fell on his back, pulled his legs into the air, and slammed his face into the floor.

Plaintiff argues that the Court should draw an adverse inference against Defendant based on the fact that there is no recording of events inside the Bravo Mod Hallway.  But for Defendant's thorough presentation of evidence regarding the technical issues at the CJC, the Court would have been inclined to do this.  However, Defendant presented substantial and uncontroverted evidence showing that, well before July 26, 2010, the CJC knew about the issues with cameras in the Bravo Mod Hallway not recording to DVR, and that it was working to address those technical malfunction issues.  Based on the record before the Court, no inference could reasonably be drawn that the recording device in the Bravo Mod Hallway was manipulated so as to conceal evidence of the incident at issue here.  As such, the Court does not consider the lack of a recording to be relevant to its credibility determination.

Based on the Court's factual findings set forth above, the Court concludes that Plaintiff has failed to show that Defendant used excessive force in the Bravo Mod Hallway.  The Court has already held that applying upward pressure on handcuffs while escorting a prisoner to punitive segregation is not excessive force.  Plaintiff admits that he dropped to the floor on his own, and the Court gives no credit to Plaintiff's testimony that Defendant dropped onto Plaintiff's back, lifted his legs in the air, and slammed his face

into the floor.  Instead, because Defendant had decided that Plaintiff needed to be transported to SD and Plaintiff refused to walk, the Court finds that Defendant did not use excessive force by, with the assistance of other deputies, moving Plaintiff in a four-point carry.  While this tactic exacerbated Plaintiff's back injury, there is no evidence that Defendant acted with malice or used more force than necessary to accomplish his objective.[5]

As such, the Court finds that Plaintiff has failed to meet his burden of showing that Defendant violated his Fourteenth Amendment rights by using excessive force during their interaction in the Bravo Mod Hallway.

### IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Plaintiff has failed to show that Defendant violated his Fourteenth Amendment right to be free from excessive force as a pre-trial detainee;

2.     Judgment shall enter in favor of Defendant on this claim;

3.     Defendant shall have his costs.

Dated this 4th day of June, 2014.

BY THE COURT:

William J. Martinez
United States District Judge

---

[5]  Plaintiff does not contend that the contact Plaintiff's head made with the door jamb or the cement floor in the Main Hallway amounted to excessive force.  (*See* ECF No. 295 at 25-26.)  As such, the Court will not consider the propriety of these actions.